Next case called for oral argument is Parker v. Lawler-Shinn. Counsel, when you're ready, you may proceed. This case began in a jury selection when I asked the jurors if they understood the law of Illinois that requires anybody who operates a car to have insurance. And then I called the witness, the witness at the stand and asked her if she was insured by State Farm and asked her to show what her policy was. And then in closing argument I said, well she's not going to pay the bill anyhow, State Farm. Now that's not this case, that's the next one. Because that's where we're going with this kind of nonsense. This is a case where there was clear-cut negligence. Finally, finally admitted on the edge of trial after all kinds of ridiculous, nonsensical, frivolous motions that were filed, including an affirmative defense, claiming that the passenger somehow was at fault for causing the accident. And on the eve of trial, an affirmative defense claims she failed to mitigate her damages without expert witnesses, without any basis for it or anything else. What you have here is a clear-cut effort on the part of the defense to make sure that Imoni Parker didn't get a fair trial. And up until now, up until now, the defense has succeeded, has succeeded tremendously. In the opening statement we talked about hiding evidence, and we're going to hear the whole story. And Dr. Locks – I think that's how you pronounce his name – takes the stand, the chiropractor. Now, this is a case. Young gets hurt, goes and sees her family doctor. She was referred by her family doctor to a chiropractor. The chiropractor sees her, treats her, and golly gee, releases her, and not at $4,999, which is the usual amount for med pay, but releases her based on his care and treatment of her. She got better. Justifies the trial. She got hurt. She got better. She has other problems now not related to the accident. And then based on that, we weave a web that the plaintiff is creating a story, hiding facts from the jury and trying to pull the hook on the jury. So when we talk about Dr. Locks, I ask him questions about his records and objection, hiding something from – there's page three there. Hiding something, you know, there might have been a picnic date. I don't know. But I'm entitled to ask the questions that I'm entitled to ask on direct examination. There's all kinds of rules of evidence that control that situation, all of which were either not known or ignored. That issue was ultimately thoroughly explained by Dr. Locks, though, wasn't it? He explained that somebody in his office had not copied that page and – I don't believe you can – I'm sorry. I mean, that was all evidence that was produced before the jury on that issue, was it not? Yes, the allegation that I was trying to keep that third page out was still there, was still there. And there was no basis for that allegation, and yet it was made. And if that were the end of the case, then I would probably sit down and shut up. But it doesn't stop there. It goes on and on and on and on, and we end up with a closing argument where we're reading from records of the medical doctor, which have not been offered in evidence, have not been tendered to anybody, reading from them. And then when I object to that, the counsel says, oh, here's more evidence that's being kept or being hidden from you. So the theme starts, and then the theme finishes. And it's just absolutely wrong. It's not any different than the scenario I gave you to begin with. You guys – everybody talks – gives lip service about being civil in the courtroom and following rules and regulations. And this kind of nonsense happens to a poor black woman who got rear-ended and hurt her back and gets her chance for a fair trial taken away from her. And it's just – it's wrong, and it's outrageous, and it shouldn't be allowed to continue. It's not a whole lot different than the Anderson case that we argued on too long ago. Here, there's just so much that happened and so much that was wrong. It's just – and what's bad about it is if one lawyer tries to comply with the rules – you know, there was, for example, in this case, motion to lay the hand on my insurance, and the insurance got into the record, but not because of anything I did improperly or anything else. There are things like that that happen. But I tried very hard, and you – some of you have tried cases with me. I've tried cases with one of you. I'm aggressive. I do all I can for my client, but I've yet to be accused by anybody of anything unethical or improper in introducing evidence, making an argument about evidence, or in closing an argument. And you can't – I can't respond to those types of arguments in any way. Once the claim is made and there's a suggestion that's made, and then at the end we get this waving the document around in front of the jury. And reading the document, there's never been an offer of – I don't know even what he's talking about at the time. But it happens throughout the trial. We cross-examined or tried to cross-examine Amoni Parker and tried to impeach her with Dr. Hillary's statements. I think the law is pretty clear that you can't impeach someone from somebody else's statement for history perhaps, yes. And you made objections to that. I made objections to that, but it just went on and on. At what time did the objection not make any difference? In this case, counsel says – defense counsel says, well, it's okay to make an improper implication as long as you don't say it's an unethical relationship between the position and the plaintiff. The plaintiff's attorney cited the case that's in it. The allegation was that I was engaged in an improper – that I was engaged in an unethical conduct. I tried to hide, conceal facts from the jury about the case. We're talking about a treating doctor equally available on both sides. He didn't call. We're talking about medical records that can easily be admitted as evidence. All you've got to do is to lay the foundation. It's called the keeper of those records. You've got to put those records in evidence. They speak for themselves. It wasn't done. And then the allegation that I'm trying to hide things from the jury. I'm outraged. Maybe you aren't, but I – this kind of – it's sort of like one person plays by the rules, the other person doesn't, and then it's rewarded for it. And this doesn't start – it doesn't start in an open statement. It starts with the nonsense that you hear on the radio and see on TV about insurance companies, about this. Remember the Allstate guy got the swoop and scoop or whatever it is when somebody pulls a button, stops real quick and calls it an accident. I've been practicing for 40 years. I've never seen that happen yet. I'm sure it does, but Allstate wouldn't lie. But that's what the jury denier sees all the time. And then when you plant the seed, oh, they're trying to make up a case. They're trying to conceal evidence. They're trying to keep evidence from you so you don't get the full story. Then the damage is done. And State Farm got by with it in this case. The other error that exists in the case in addition to all of that, I don't know what the law of the Fifth District is anymore about photographs. I know what it should be. I know that if you have a photograph of a car, somebody should back that up. In this case, the photograph of the plaintiff's car, there wasn't even an old-fashioned foundation. It wasn't the same as it was before. They didn't even lay the prop foundation for that. The owner of the car, Lloyd Parker, testified he had fixed it. He had hammered it with something before those photos were taken. Yet it goes in. And then we make the argument, well, this was such a soft exit, such a slow impact, it couldn't possibly have caused any injuries. And who gets that testimony? In the cases where you have allowed photographs in, you've had expert testimony. I guess Penelope is going to make a killing on it. She's testified in four or five cases of mine now about cars and photographs. But in this case, we don't have that. We have a KISS. Now, KISS turns out to be so significant that the rear bumper, the front bumper of the plaintiff's car is broken. It's a plastic bumper. It's supposed to be able to sustain impact up to 20 miles per hour. And yet it's broken. It has to be replaced because of this low-impact accident. But the photos don't show that. The photos don't show a crease in that bumper. So you're asking the jury to guess, to speculate about how hard the impact was and could it have caused the injury. You just can't do that because that is, in fact, offering medical testimony and allowing the jury to guess and speculate about medical testimony. I had a case last summer. The passenger is killed. A rope breaks his neck. The driver walks away. You know, it happens. Unless you've got expert testimony to back up what those pictures show, you can indeed mislead the jury. And the jury is, in fact, misled. You can get injuries. And Lamoni Parker did get injuries in a low-impact accident. The trial court committed, in this case, let's get back to the pleadings. I know boys will be boys, and you guys want to stay out of that nonsense. But these numerous pleadings that were filed in this case, on top of everything else, there's no factual basis for any of them. Rule, Supreme Court Rule 137 says there has to be, after proper investigation, has to be a basis for the pleadings. How can you plead on the eve of trial in affirmative defense of failure to mitigate damages without an expert witness, without a doctor to testify, without any of that? That's being there without anything like that disclosing the answer, of course, is you can't. How can you plead affirmative defense if the passenger did something that caused her injury when she's sitting in a car that she claims is stopped at the time? The trial court didn't allow the failure to mitigate damages, right? I don't know if he didn't allow them or after argument they were withdrawn, but they were not fled. In other words, the trial court determined that there was no expert who could render that opinion and it would be a violation of Supreme Court rules to allow it. Is that correct? So it didn't actually go in. I don't know if his basis judged it didn't go in. All right, and your argument about that is on the sanctions issue then. My argument about that is that it's ridiculous that what you see here is a pattern. And the pattern is to make it as hard as possible for soft tissue impact cases to be tried. And you can do that by making it hard on the lawyer by filing lots of frivolous motions that have no basis in fact, by denying negligence when it's clear cut, by forcing people to jump through those hoops. And that's what happened here. And then when you get to the trial case, you can deny the defendant the claim of fair trial by engaging in these types of tactics. And then we get to just some substance issues. Showing a photograph of the jury that without anybody being able to back up what those photographs say to show that yes, this is low impact and because it was low impact injuries couldn't occur, is asking the jury to engage in speculation about medical evidence. And that's wrong. And I've cited the cases that are here. There's a recent case that's not cited that I'm sure you're all aware of. Again, Penelta or Pantella was a witness in that case as well. But when you show photographs of a car, for example, if you don't show the underneath of the car, how do you know whether or not the frame is damaged or not? In this case, the photos don't show that the bumper was damaged. Does the plaintiff have to counter that evidence? Is the plaintiff in every soft-tissue low-impact case required to call a biomechanical engineer to show that a speed of 20 miles an hour or 25 miles an hour can in fact cause soft-tissue injury? Or does the defense have the burden of putting on medical testimony that counters the treating physician's testimony? It's got to be. It's got to be. If they're trying to offer those photographs and argue to the jury, this photograph shows that there couldn't have been any injury. Somebody besides the defense lawyer has to make that statement in front of the jury. It can't be left to allow the jury to engage in speculation. When you look at this case from the beginning to the end, Moni Parker, a poor black gal who was going to celebrate being trained to do tax returns for H&R Block. And she gets rear-ended in here and gets her back where she sees her family doctor. Didn't go see a lawyer first, and on the way there she sees a chiropractor. Family doctor refers her to a chiropractor. She sees the chiropractor is treated and released. She comes to court limping. She's got a problem with her leg. She says, as nothing to do with the accident, that happened later on. And then that person is denied a fair trial because the defense engages in repeated, outrageous conduct, implying that she, and not just she, but mainly me, that her lawyer, is making stuff up and hiding stuff. I never met Dr. Locke before he took the witness stand. Never talked to him before that day. Dr. Hillary was available to either side. I didn't call her because it's obviously these cases you can get a fortune tied up in and you win the case. It doesn't get any money. I didn't call her for tactical reasons, but there's no reason why the defense couldn't have. No reason why the defense couldn't have called her. No reason why the defense couldn't have offered the medical evidence, the medical records and the evidence. No reason why everything the defense wanted to do couldn't have been done properly without engaging in this outrageous conduct. And yet the conduct was done. The conduct was reported. And if this court doesn't reverse, we'll be encouraged, not just condoned, but encouraged. And you're going to have a situation where somebody on the plaintiff's side says, well, Illinois law requires everybody to have car insurance, so can I make that argument to the jury? They have to know that. Outrageous? Absolutely. But why is that different than what we're talking about here? Thank you, counsel. Counsel? May it please the court. Mr. Womack, Justice's name. I represented Michelle Waller during the trial of this case. And truth be told, I've dreaded this day for quite some time now because I suspected that Mr. Womack would lodge personal attacks against my character in front of a courtroom full of my peers. And it turns out that my fears have come to fruition. He's essentially saying that I cheated and I did not follow the rules in this case. And my character is something that I hold in high regard. And I've always been taught that character is all that you have, and once you lose it, you have nothing. So if this court finds that I did do something wrong and that I didn't follow the rules, then I ask you to send it back. Because I don't want to win by cheating. However, I do know the rules and I did follow them. And I'm prepared to defend my actions that we took during the pretrial stages and the trial stages. I'm not insinuating that I know as much about the law as Mr. Womack. He's probably forgotten more law than I'll ever know. And I'm not insinuating that I'm as an experienced trial attorney as him yet. But I do know the rules and I did follow them. If anything, it would appear that the plaintiffs received a fair trial based solely on their decision to retain Mr. Womack to defend them. Mr. Womack is not the type of attorney that will allow his clients to receive anything less than a fair trial. But in regards to the rules, it appears that he follows them when the circumstances are favorable for doing so. By my count, at least seven out of the 14 paragraphs of the plaintiff's statement of the case contain improper comments, improper arguments, or other assertions that are not supported by the record. That is in direct violation of the rules promulgated to government. The procedures taken in this court, it's in direct violation of Rule 341. In that regard, if the rules are to be followed, this appeal should be dismissed for plaintiff's failure to comply with them. But subject to that, I'll address each of the objections that Mr. Womack raised today and in his brief. Mr. Womack, his first objection dates all the way back to our initial denial of the complaint. And he complains that we did not make a reasonable inquiry into the facts of this case and had no good faith and did not conduct a good faith ever to answer honestly. The plaintiff cited the Kretten case solely for the language that's in that case and not for the substance of what it stands for in regards to Rule 137. In Kretten, the defendants filed an answer to an interrogatory stating that a conversation never took place. And then they filed a privilege law stating that the conversation is privileged. So they said that it didn't take place, but then they said it was privileged. This is clearly a lie. It was clearly a lie. It was clearly sanctionable behavior, and it's just as clear that Kretten does not apply to this case. In this case, what we did was we made an inquiry of the facts, and the facts in the very beginning remained the exact same as they are today. The inquiry that was made and the answer that was given was the same when we denied the case or when we filed the answer. It was the same during her deposition. It was the same as the evidence. It was the same as the evidence that was eventually used at trial. Michelle Waller testified that plaintiffs were stopped at a red light, the light turned green, the plaintiff supplied their breaks after proceeding forward, and Michelle were in the middle. This has been the exact same story from the very beginning, through the deposition, through the trial, and remains the same today. The question, then, is whether there is a good faith basis to answer denial of negligence in this case. And if the court accepts that version of the facts is true, based on Thomas, plaintiffs, they stopped at an unexpected place, i.e., a green light. And whether the defendant's act of tapping the plaintiff's vehicle created a scenario that caused the accident to be unavoidable is a proper and good faith basis to deny negligence. A rear-end collision does not automatically create an inference as a matter of law that the driver of the rear vehicle was negligent. If that was the evidence throughout the entire pretrial proceedings and trial, then why did you end up admitting the fault? Okay. I'll address that right now. This is turning now to their motion for summary judgment. And, Justice, you have to remember that plaintiffs filed their motion for summary judgment at the very last second. It was filed on Thursday, the final pretrial conference date. Now, this was in violation of St. Clair County Local Rule 6.01 that requires at least 21 days' notice of the hearing, and it's not to be heard before then. But the trial is expected to begin Monday. I was ready, I was prepared, I wanted the trial to begin on that Monday. The case had gone on long enough. And coincidentally, depositions in that case were taken a year before they filed the motions for summary judgment. The facts had not changed for a year. There's no good reason why they had to wait until the final pretrial conference. Was the trial judge going to proceed in violation of the local rule? Well, I waited. I didn't seek to enforce it because I wanted to go to trial on Monday. And this was a Thursday, so there was only one workday in between. I knew that if I saw it… So the trial judge was going to continue the trial? Well, I don't know, because we didn't get there. I didn't seek enforcement of it. We heard their motion for summary judgment. We argued it that day, minutes after it was filed. I said, well, let's go argue it. And we argued it. So you didn't object to the late filing of it then? No, I didn't. But I used it… I brought it to the judge's attention, but I said, subject to that, we'll proceed. And so we argued it. And plaintiffs assert in their brief that Judge Lechine was about to grant it. And then at that second, I said, whoa, I'll admit fault here but deny liability. How Mr. Womack knows this blows my mind. He wasn't even there. His attorney, his associate, Ralph Bloodworth, was there. And that is not the case. There was no indication by Judge Lechine at all. I was there. There was no indication that he was going to grant it. He said, I'll give you an opportunity to brief the issue since they didn't give you proper notice. And I need to look at it, and I'm going to research it. You must not have been very impressed with your strong defense on liability if you gave it up as easy as you did. I was impressed with it. I was impressed. And the reason why I gave it up was because my thinking at that time was that this is going to get continued. This is going to get continued. So you'd rather go to trial on Monday admitting fault than preserve your defense on the issue of liability. And I did preserve my defense on the issue of liability. Well, on fault, on negligence. On fault, yeah. I would be willing to do that. And that was a strategic decision. I said, you know what? I'll give that up. I will give up fault. Fine. Leave her in. You still have to prove that she was injured. You didn't get to go to trial on Monday anyway. Right. We didn't get to go to trial on Monday. You're absolutely right. We get there. Monday morning. Mr. Womack is sitting at the counsel table. Nothing out on his desk. I walk in. I unload all of my documents. I unload everything. I unload my exhibits. I unload my papers. I sit down. All the meanwhile, he sees me doing this. And he says, come join me in Judges' Chambers. Doesn't tell me all that's going on. We go to Judges' Chambers. He seeks a continuance. Over my objection on that Monday, it's granted. And so then we get our new trial setting. And it's not until that time that all of these post-continuance pleadings were filed. He says that we filed all of these motions. We caused this unnecessary delay. They are the ones who consent to my admission of fault but deny all liability. They are the ones who sought a continuance. They are the ones who sought a motion to reconsider their agreement of me to admit fault but deny liability. They are the ones who sought to motion a veneer. All of these are done after the trial is supposed to be finished. I mean, the trial is supposed to begin in the end. All by the time that any of this is done. So we had a good faith basis to deny the motion for summary judgment. We had a good faith basis to deny negligence in our answer. The strategic decision to admit fault but deny liability was a strategic one. It's not sanctionable, and it's certainly not reversible there. Now, regarding the affirmative defenses that he takes exception to, Lloyd Parker is Imani Parker's husband. He had a loss of consortium point. We filed an affirmative defense stating that if Lloyd Parker's contributory negligence contributed to Imani Parker's injuries, then Lloyd Parker's damages should be reduced according to his own contributory negligence. That's just following the Supreme Court. They said if the consortium plaintiff injures the injured spouse or causes or contributes to it, then the consortium plaintiff's negligence is reduced proportionately. So you didn't file any request for any contributory negligence claiming that Imani Parker was contributory negligent? No, no. It was solely against Lloyd Parker. And it was in affirmative defenses one and two. And incidentally, when we filed those affirmative defenses, the consortium claim was still in effect. Later, it wasn't until March sometime, the plaintiffs withdrew the consortium claim, and in that regard, the affirmative defenses in that matter were stricken as well. So there was a basis in law, in fact, for that pleading as well, and there was no error to not levy sanctions against us. And then the final objection to the pleadings part is that the failure to mitigate damages. Well, the medical records showed that she waited four months to go see a chiropractor. The deposition testimony, which ended up being the exact same testimony at trial that I cited in our brief, was that she began to experience pain, she didn't follow up like she should have, and that exacerbated her pain. And at the time of filing the pleadings, that's what we knew. So there was absolutely no… That was deposition testimony by the chiropractor? No, by the plaintiff. By the plaintiff. By the plaintiff. And so at the time when we filed these affirmative defenses… Let me make sure I understand. She said in her deposition, I had pain, but I didn't go to the doctor for a while. My back was bothering me after the accident. I just didn't follow up on it like I should have. All right. She said I should have gone to the doctor earlier. Did any doctor testify that that in any way exacerbated her injuries? No. And at the time you filed the pleading, you didn't have any expert opinion in that regard, is that right? Correct. And at trial, you didn't have any expert opinion in that regard? Correct. But whether or not those allegations of an affirmative defense come to fruition doesn't mean that we didn't have a good faith basis to assert it in the affirmative defense. You know, if we were looking at the medical record, and that's what we had, she waited. And coupled with her deposition testimony, then we have a good faith basis. Whether or not we're able to prove it, which eventually it never even – As a matter of fact, it was stricken because you didn't have any expert testimony. Yeah, it was stricken after the close of all evidence. But that doesn't mean – it wasn't stricken prior. I thought it came up in pre-trial conference with Judge LeChene, and he indicated under Rule 213 he wasn't going to allow it. Well, he said he was going to allow it. He was going to allow me to amend it. And I did. And I finally amended it. And so it was in effect. I mean, it was there. And, yeah, don't get me wrong. I'm not trying to tell you that we proved failure to mitigate. But, you know, that's of no consequence when it comes to the actual filing of it. I mean, we had a good faith basis for it, and an inquiry was made, and it wasn't sanctionable behavior. Judge LeChene saw it. He looked at it, and he decided against sanctions. And this court is going to give considerable deference in the trial judge's decision whether or not to impose sanctions. So, you know, they argued that – now turning to my conduct during the trial, as I stated before, you know, I'm not as experienced a trial attorney as Mr. Womack. In fact, this was my first jury trial. And in that regard, some of the questions posed to Dr. Lobbs, they were probably worded poorly. And I'm not bringing this up to engender sympathy or make excuses. But like I said before, you know, if you think that I committed error, send it back. However, I did not try to, nor did I commit any of the guerrilla tactics that Mr. Womack asserts that I did. There was no theme of hiding evidence from the jury. You usually bring up a theme in your opening statements, and the word hidden isn't there once. I don't think that's the best way to develop a theme throughout the trial. The theme was that the plaintiffs had the verdict proof that Monty Parker was injured as a result of this accident, and they failed. That's it. I never said. Well, they put on evidence through the treating chiropractor who testified within a reasonable degree of medical certainty that she was injured, that it was caused by the accident, and so forth and so on. And you put on no evidence in that regard. Well, I would respectfully disagree with you that I put on no evidence in that regard, because the basis of his opinion was the facts of the accident as they occur and Imani's complaints of pain. He stated he did not know when the onset occurred of pain. He didn't know when she began to experience pain, but it would not probably occur three and a half months after the accident. He didn't know that. He didn't know that it didn't happen. Despite all that cross-examination, though, he stuck with his opinion. Sure. But there's evidence to support that the jury is being discredited. They don't have to stick with it just because he stuck with it. He said based on the accident occurring at 30 to 40 miles an hour, that's a big part of it. He said based on that and based on her stating she was injured in this car accident, you know, she said that. Then he said everything correlated beautifully. And he objected to my use of the term correlated beautifully, and I think I pointed out to this court that he did say that out direct. Will you agree with me that the jury had to disregard the plaintiff's expert's testimony in order to render a defense verdict? Yes, I would agree. And I think that they had a basis to do so. I think I gave them the basis to effectively discredit his opinion. Because he relied on the history given to him by the patient. He relied on the history of how the accident occurred, and the accident did not occur as the way that they said it. And he also stated he didn't know the onset of pain. He didn't take that into consideration. All he took was that she said she was injured in the accident. Mr. Weinberg asked him, he said, he asked you, you know, did you, did you ask, did you, did you figure out, did you diagnose Imani Parker as having been injured in this accident as a result of your independent examination of her or because she told you that? And the doctor said, well, you know, it wasn't that he said, oh, it's just based on me. He relied on Imani, and he relied that saying I was injured. And then, yeah, so he goes through and he says, yeah, you're injured. But there's absolutely a basis because he, because the basis of his opinion was the facts of how the accident occurred and her stating it. So now you look and you say, all right, well, what are the facts as presented by the plaintiffs? And they say, well, the accident occurred 30 to 40 miles an hour, and it was so hard. Question mark. She put on her. She put on her questionnaire at the chiropractor's office 30 to 40 miles an hour question mark. And the doctor testified that he took that to mean that she didn't really know how fast it was going. OK. Right. Yes. Yes, sir. But there's also he also there's also testimony stating that he relied on the plaintiff's version of the facts of the act. And so you got to look at what the plaintiff's version of the facts of the accident are. Well, I didn't the chiropractor actually say I didn't rely on that statement of the speed because it was apparent to me. And from talking to her, she didn't really know how fast it was going. To be honest with you, I don't know. All I know is that he said I relied on her version of the facts of the accident as given to me. And so in that regard, you got to look at what the facts of the accident is given to him off by the plaintiffs. They say that happened at 30 to 40 miles an hour. Boyd Parker says if I wasn't wearing my seatbelt, I'm going through the windshield. That's how hard the impact was. The there is the record is replete with with testimony from everyone, including my client. Everyone except the plaintiff that this was a very, very minor accident. My client said it happened zero to three miles an hour.  It was very, very minor. The body repair guy said it cost around 300 bucks. And in the photos of the damage, the jury believed supported my client's position. And I'd like to talk about the admission of photographs with the court's consent. It would take about a minute, but. Why don't you say that? Okay. Thank you very much. Well, we you're not waving. We stand on three or something. Yes. Thank you. Council. You know, I tried my first case about a hundred years ago. And I know nervous and concerned and all that. But it doesn't allow you to violate the rules. And the thing is, if if if anybody starting now, I remember the judge. I said, I don't understand your objection. And he said, I said, may I approach? He said, sure. He said, I would suggest you go by the text on evidence. And that's that was his attitude about what you do. The conduct here, you know, I'm not accusing this. This is a very nice young man who comes from a great lineage. He's going to be a very good lawyer someday. But he's not going to be a good lawyer if he keeps on with this kind of nonsense. Those pleadings were nonsense. They had nothing to do with the defense of the case. They were just designed to harass. That's the only thing you can say about it. And the firm of defense, the firm of defense was applied to both count one and two, her count and his and the husband's. And you can't raise a firm of defense that the husband was next to the cause of her injury. And had filed a third-party complaint and bring him in and all that kind of nonsense. None of that was there. Then when you talk about, it doesn't take a genius to figure out that you cannot read to the jury from evidence that was never offered, never admitted, never not there. Again, you objected to that, though. And what did the trial judge do? The judge disdained it. First of all, he didn't because he didn't hear what happened. And then he disdained it. Why did that not cure that problem? Because then counsel said, here's another piece of evidence you're not going to get to hear. And did you object again? I did. And was it sustained? It was. Okay. And my position simply is it's cumulative. And that conduct, getting back to, like, the cross-examination of the doctor, you pointed out the question of our defense counsel said repeatedly, argued repeatedly, that she said that the B was 30 to 40 miles an hour. She never said that. Absolute falsehood, absolute misconstruction of the testimony. And he had her deposition. Or in her deposition, she said she had her back turned, didn't see the car, had no idea how fast the car was going. She thought because of the impact, it was 30 to 40 miles an hour, and she put that question mark there. So the judge said, how much air do we have to have before it becomes cumulative and denies I'm going to have a fair trial? And I guess that's your question. I think there's too much. I think when you talk about hiding evidence with Dr. Lox, when you talk about keeping the jury from hearing what Dr. Hillary had to say, when you talk about concealing Hillary's evidence, all of that combined resulted in the jury ignoring the only testimony about how the injury occurred. There was no testimony contradicting the chiropractor's testimony. And this nonsense about her not ever seeing the doctor, she saw a doctor and told that doctor, according to her testimony, about her injuries. And that doctor then eventually referred her to the chiropractor. All of these things that were built up into the case and put into the case were there, and they were based on falsehoods. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take the case under advisement. Thank you. Thank you. The next case called for oral argument is Ware v. Wee Wee. Counsel?  Good morning. I'm here to represent Fred Ware, my client, my friend, who I think is suffered an injustice. I'm not here to review the character of the jury or the judge. I do threaten my counsel. You know, just recently we've all seen the video. Apparently, by everyone's account, wonderful. Out in baseball. Two outs. The guy's pitching the perfect game. The batter hits the grounder. The pitcher picks it up, throws it to the first. The guy is clearly out. And the ump blows the ball. And he clearly made a mistake. He didn't make a mistake because he was against one side or toward the other side. But those are the sort of things, I think, that happened in this case. And that's why my client suffered an injustice. And we need to correct it. This is a case where the facts really are not in dispute. My client goes into the bar. He gets shot by a patron in the bar who shouldn't have been in there to begin with. I want to talk about the law of admissions. And I also want to talk a little bit about jury notification. And why I think this jury got this so clearly wrong. I mean, the two most shocked people in the courtroom when this jury came back were my family. Because the facts were so overwhelming. Lee Lee Inc. ran a place in Venice, Illinois, called Ace's Bar. And it's owned by a fellow man and wife. And their first cousins were security. And Derek Williams, who was one of the owners, as a very matter of fact, he testified twice at trial and once through his deposition. But Fred Ware was a great guy. He was a great customer. We never had any problems with him. Never caused fights. Didn't get in trouble. Never had an accident. That his first cousin was killed at a bar in Venice. Something stupid. Small fight inside. They walk outside. The guy gets shot. And he recognizes that if you're going to have a bar in Venice, you need to provide security. And you need to provide security twice. He's telling the jury this. Not once, but twice. And so when he opens his bar, he wants to make sure there's adequate security. Because you need it.